Garrick S. Lew (SBN 61889)
1000 Brannon Street, Suite 488
San Francisco, California 94103
Telephone: (415) 575-3588
Facsimile: (415) 522-1506
Email: gsl@defendergroup.com

Attorney for Defendant
HARI JAMIL DILLON

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> HARI JAMIL DILLON, ) <br> ) <br> Defendant. ) <br> _____ ) | No. 3:10-cr-00500 CRB <br><br> DEFENDANT'S SENTENCING MEMORANDUM <br><br> Court: Hon. Charles R. Breyer <br> Date: January 29, 2013, 10:00 am |

## I. INTRODUCTION

Pursuant to a "cooperation" Plea Agreement, Hari Dillon entered pleas of guilty to two counts of a violation of 18 U.S.C. 1343, Wire Fraud, and two counts of a violation of 18 U.S.C. 1957, Money Laundering. The United States Probation Office has prepared a Presentence Report (PSR) and concluded that the advisory United States Sentencing Guideline (USSG) is Total Offense Level 27, Criminal History Category I.[1] The United States has indicated that it will file a motion pursuant to USSG 5K1.1.

Mr. Dillon comes now before the Court requesting that he be sentenced to 18 months

---

[1] The parties agreed in the Plea Agreement that the advisory Guideline is Total Offense Level 24, Criminal History Category I. Mr. Dillon agrees that the PSR calculation is technically correct, but, consistent with the parties' agreement, requests that the Court begin its sentencing analysis consistent with a Level 24 range, or 51-63 months.

Defendant's Sentencing Memorandum
*United States v. Dillon*, 10-00500 CRB        1

imprisonment, to be followed by a term of Supervised Release, and that he be ordered to pay restitution.[2]

## II. BACKGROUND

The PSR provides significant detail about Hari Dillon's background that need not be repeated here. However, there are salient facts about Hari Dillon, his background, and his involvement in the present offense that bear repeating.

Although born in the Central Valley of California, Hari's family roots are in India. His paternal grandparents and other relatives were involved in the movement to free India from British colonial rule. Social justice has always been part of the "culture" and conversations of the Dillon family. Hari's father was a successful farmer and his mother worked for many years for the Internal Revenue Service. Born in Fresno, Hari was raised by his intact family in the Fresno area. Hari's three younger sisters are all college educated and have had professional careers. As a high school student at Caruthers High School, Hari earned "A's" and participated on the football and basketball teams. After graduation in 1966, Hari moved to San Francisco and entered the then San Francisco State College (now University).

At San Francisco State, Hari's commitment to social justice movements, which would be the hallmark of his life, truly emerged. He joined the student protest movement of that era, which focused on ending the Vietnam War, recognition of minority and women's rights, and the development of ethnic studies programs at the University. During Hari's four years at San Francisco State (1966-1970), he was arrested six times for involvement in student protests. Each arrest evolved out of a student protest or demonstration. He has no other involvement with law enforcement.

Always economically self-sufficient, although clearly never economically well off, Hari supported himself through college and after he left San Francisco State before completing his degree in History and International Studies. He worked for over six years for Laidlaw Transit and over five years on the assembly line at Hublein Bottling Plant. It was while at Hublein that Hari joined the International

---

[2] The Plea Agreement allows for Mr. Dillon to argue for a sentence no lower than 18 months, or no lower than the United States' recommendation if that recommendation is lower than 18 months.

Longshore and Warehouse Union (ILWU). From that employment, in 1972, he was able to obtain a cooperative apartment at the ILWU development St. Francis Square in San Francisco, in which he lived until his 2009 bankruptcy evolving from the present offense. Hari's lifestyle has never been lavish.

Always involved in the social justice movement, Hari was able to obtain employment pursuing his social justice interests when he joined TecNica, a non-profit agency that provided technical expertise and assistance to programs in primarily Nicaragua and Southern Africa. Its work was very similar to that of the Peace Corps. Soon after joining TecNica, he was promoted to Executive Director, where he remained until joining Vanguard Foundation in 1990.

Hari was married in 1968 to Elena Ludwig, whom he met at San Francisco State. They remained together for 22 years and have two children. A measure of Hari Dillon as a person is the children he raised. 41 year old Jeffrey is a graduate of San Francisco State University and holds a Master's Degree in Education from Holy Names College. He is a teacher recruiter for the Oakland Unified School District. Jeffrey has a 20 year old son who attends Linfield College in Oregon. Hari's 34 year old daughter, Jennifer, is a graduate of Mills College and holds a Master's Degree in Statistics from Harvard University. She is a former college professor and now runs her own tutoring business in Washington, D.C. Although not an excuse for his conduct in the present case, much of the money that Hari misappropriated was used to support his daughter's and grandson's educations and living expenses.

Hari joined Vanguard Foundation in 1990. In 1994, he became President and Chief Executive Officer of the foundation. Not an "endowed foundation," Vanguard raised money primarily through donations each year, which it distributed to organizations and programs that promoted social justice causes and endeavors. Each year the foundation had to raise money to fund the programs it supported. In the late 1990's, a benefactor made available a short term stock investment opportunity for Vanguard and its related participants that yielded a significant return and funded a number of Vanguard supported programs. That experience laid the groundwork for Vanguard participant's and Hari Dillon's vulnerability to the "con" perpetrated by Mouli Cohen that has resulted in the present prosecution. That prior experience contributed to Hari's ultimate misconception that Cohen's assertions were credible.

Defendant's Sentencing Memorandum
*United States v. Dillon*, 10-00500 CRB     3

1   Vanguard had simply done it before, albeit on a smaller scale.

2       The facts of this case are well known to the Court, as Mouli Cohen proceeded to jury trial and the

3   PSR fully outlines the circumstances. Hari Dillon, as part of his cooperation agreement with the

4   Government, testified at the Cohen trial, which the Court observed and which resulted in Cohen's

5   conviction and substantial sentence. Hari's cooperation with the Government, however, began before

6   and extended beyond his testimony.[3] As attested to by agents, Hari was instrumental in creating a ruse

7   that enabled agents to locate and arrest Cohen soon after he was indicted.

8       During debriefing by the Government, during his trial testimony, during interviews with the

9   Probation Officer, and in written submissions to the Probation Officer, Hari has fully and completely

10   taken responsibility for his illegal conduct.[4] He wrote:

> I accept complete responsibility for my offense. My actions are inexcusable. I should have been not only far more careful and diligent in the accounting of other people's money, but even more importantly, absolutely scrupulous in the use of those funds. I had no right to use their money, even though I genuinely believed I would have the capacity to replenish the funds and make everyone whole when the Mouli Cohen 'deal' was consummated.

PSR at ¶25.

    As the Court now knows, Mouli Cohen was able to convince Hari, and many other far more

---

[3] *See* United States' Sentencing Memorandum and Departure Motion Pursuant to USSG 5K1.1. and Letter of Peter Rehon, forthcoming, to be submitted under separate cover.

[4] Hari Dillon has taken full responsibility for his conduct, contrary to the outrageously distorted perceptions of victim Cindy Woods. Understandably, Ms. Woods feels violated by Hari's conduct. However, her assertions about his character and background are the reflections of her perception of Hari's betrayal and are not rooted in reality. Hari sustained an over 45 year commitment to social justice that was not rooted in his "narcissism," as Ms. Woods suggests, but rooted in his concern for social justice. Indeed, others equally close to Hari have offered a far different perception. Dr. Irva Hertz-Picciotto wrote:

> Hari does not make excuses for himself. In every conversation I have had with him, he expresses his deep regrets and pain at having convinced donors to put their money into investments that never existed, misappropriating funds, and other illegal actions. He knows that what he did was wrong, and far from defending his actions, he readily admits his guilt. In fact, at times he appears to be racked with guilt, reviewing in detail what he should have or could have done, had he understood more.

*See* Letter of Dr. Irva Hertz-Picciotto, submitted as Exhibit A (additional letters in support are attached as Exhibit B). Accordingly, the Court should consider Ms. Woods' assertions cautiously.

sophisticated investors and money managers than Hari, that his stock offering was legitimate and would yield substantial returns. Cohen kept "going back to the well," and it paid off for him. As part of the process of raising more and more money, Cohen convinced Hari and others that funds were needed to pay regulators to complete the sale of eCast to Microsoft Corporation (a total lie). At one point, investors simply gave money for that purpose to Hari, who was to pass it on to Cohen. Over the years that this fraud took place, Hari used some of that money for his personal expenses, expenses that included paying for his daughter's and grandson's education expenses and housing for other family members, without the investors' permission.[5] Hari has stated that he completely believed Mouli Cohen and that he anticipated a substantial "payday" when the eCast shares were to be traded for Microsoft shares. He was going to use his share of that payday to repay the money he had taken and been loaned. Importantly, Hari's offense is the taking of money investors intended to go to the eCast - Microsoft transaction. Hari was not part of Mouli Cohen's fraudulent scheme. He was a victim of Cohen. As stated in the PSR Sentencing Recommendation,

> Dillon was unaware of the fraudulent scheme and believed he was soliciting money from Vanguard contributors for the ultimate purpose of increasing Vanguard's endowment thus allowing them to provide more grants to the charities and non-profits Vanguard supported.

PSR Sentencing Recommendation at 1.

Admittedly, and as he has fully articulated, Hari's head was turned by the prospect of significant profits from the eCast-Microsoft transaction. He was taken in by Cohen. He has admitted that the profit potential from the Cohen proposal affected him. He believed he would have financial resources never before available to him. He was wrong and he admits it.

Hari has endeavored with all that is in his power to make the victims in this case whole. He began that process by assisting with the prosecution of Mouli Cohen. He also is assisting counsel for a number of the victims in litigation that has the potential to yield millions of dollars that can be paid to the victims.

---

[5] Investors also made significant personal loans to Hari during this time, which he used to make his own investment in eCast and pay personal expenses. In the various accountings that have taken place since these events, it has proven difficult, if not impossible, to disentangle these legitimate personal loans from the money that Hari misappropriated.

That litigation is pending and Hari is to testify at a deposition in preparation for trial. *See* letter of Peter Rehon, to be submitted under separate cover.

Hari Dillon has already paid a significant price for his illegal conduct. Vanguard, to which he has devoted his life, is essentially defunct. He has lost his home, his modest income, and his self-respect. He has been fundamentally homeless for several years and his health has deteriorated. At age 64, he suffers from diabetes, hypertension, hyperlipidemia, and an enlarged prostate. Without health insurance, he has not been able to comply with the medical advice he has been given. In approximately two months, however, he will become eligible for Medicare. His employment prospects are dim.

## III. APPLICABLE SENTENCING LAW

The landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), changed sentencing in the Federal Courts. *Booker* renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in 18 U.S.C. 3553(a). Once all of the factors in 3553(a) have been considered, the court is to impose a "reasonable sentence."

> We infer appropriate review standards from related statutory language, the structure of the statute, and the 'sound administration of justice.' And in this instance those factors, in addition to the past two decades of appellate practice in cases involving departures, imply a practical standard of review already familiar to appellate courts: review for 'unreasonableness.'
>
> . . . Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.

*Booker*, 543 U.S. at 660-661.

The Supreme Court addressed the issue of the "presumption of reasonableness" of a within Guidelines sentence in *Rita v. United States*, 551 U.S. 338 (2007) and instructed that a within Guideline sentence is presumed reasonable only upon appellate review. The Court stated:

> We repeat that the presumption before us is an appellate court presumption. Given our explanation in Booker that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review. The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. 18 U.S.C. § 3552(a); Fed. Rule Crim. Proc. 32. He may hear arguments by prosecution or defense that the

Defendant's Sentencing Memorandum
*United States v. Dillon*, 10-00500 CRB        6

> Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines, to apply, USSG § 5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. *See* Rule 32(f). Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. See Rules 32(f), (h), (i)(1)(C) and (i)(1)(D), *see also Burns v. United States*, 501 U.S. 129, 136, 111 S. Ct. 2182, 115 L.Ed. 2d 123 (1991) (recognizing importance of notice and meaningful opportunity to be heard at sentencing). In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. *Booker*, 543 U.S. at 259-260, 125 S.Ct. 738, 160 L. Ed. 2d 621.

*Rita*, 551 U.S. at 214. Further, the Court instructed:

> The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness. Even the Government concedes that the appellate courts may not presume that every variance from the advisory Guidelines is unreasonable.

*Id*. at 216. The Ninth Circuit was heard on the presumption of reasonableness and directs:

> A court of appeals may not presume that a non-Guidelines sentence is unreasonable. Although a court may presume on appeal that a sentence within the Guidelines range is reasonable, id, we decline to adopt such a presumption in this circuit.

*United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008).

The Guideline range is simply the beginning of the analysis for sentencing, not the end. The Ninth Circuit stated:

> 'The Guideline's factor may not be given more or less weight than any other.' So while the Guidelines are the 'starting point and initial benchmark' and must 'be kept in mind throughout the sentencing process,' the Guideline's range constitutes only a touch-stone in the district court's sentencing consideration.

*United States v. Autery*, 555 F.3d 864, 8l72 (9th Cir. 2009).

With the Guideline range just the beginning, the sentencing court is to then consider all of the other factors in §3553(a) and reach a sentence that is "substantively reasonable." *United States v. Ressam*, 629 F.3d 793, 828 (9th Cir. 2012) (en banc), defined "substantive reasonableness:"

> A substantively reasonable sentence is one that is sufficient, but not greater than necessary to accomplish §3553(a)(2)'s sentencing goals. The touchstones of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 USC §3553(a). In determining substantive reasonableness, we are to consider the totality of the circumstances, including the degree of variance for a sentence imposed outside the Guidelines range.

Defendant's Sentencing Memorandum
*United States v. Dillon*, 10-00500 CRB     7

The Court must now consider 18 U.S.C. 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed --

   (a) to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

   (b) to afford adequate deterrence to criminal conduct;

   (c) to protect the public from further crimes of the defendant; and

   (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.

18 U.S.C. 3553(a).

The Supreme Court has also cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. In *United States v. Gall*, the Court instructed sentencing courts to make an individualized assessment of the appropriate sentence for each particular defendant:

> [T]he unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.

*United States v. Gall*, 552 U.S. 38, 54 (2007).

In order to meet the mandate of the *Booker* remedy, then, this court must calculate the appropriate guidelines range and may consider appropriate departures. It must also apply the 3553(a) factors and address any other specific characteristics of the defendant or his offense that might impact the determination of a "reasonable" sentence under the particular circumstances of this case. The district court's sentencing decision will then be subject to an abuse-of-discretion review by the circuit.

Substantial assistance departures post-*Booker* have changed to the extent that the Court may now consider such departures in fashioning a "reasonable" sentence. *United States v. Mohamed*, 459 F.3d

979, 986 (9th Cir. 2006) (scheme of upward or downward departures is now replaced by a "reasonable sentence" standard). The Court is then empowered, indeed directed, to consider all of the factors related to the defendant's circumstances, his offense, and his cooperation, in fashioning a sentence that is "reasonable." The Court must reach its own conclusions about any departure and its extent and is not bound by the recommendation of the government, once a substantial assistance departure motion has been filed. *United States v. Udo*, 963 F.2d 1318 (9th Cir. 1992).

### IV. A REASONABLE SENTENCE

Hari Dillon, consistent with the agreement of the parties in the Plea Agreement, requests that the Court find that a reasonable sentence in this case is 18 months imprisonment, to be followed by a term of supervised release, conditioned upon payment of restitution.[6]

Under 18 U.S.C. 3553(a), the first consideration is the nature and circumstances of the offense and the history and characteristics of the defendant. As indicated in the PSR, it is clear that Hari Dillon was taken in by Mouli Cohen's fraud, as were the rest of the benefactors of Vanguard. Hari's offense conduct was NOT the larger fraud perpetrated by Cohen, despite the misguided belief of at least one victim. His illegal conduct was serious enough, but it was not the eCast-Microsoft transaction fraud.

Hari Dillon's illegal conduct must be considered in context of all the good he has accomplished during a lifetime devoted to social justice. As a young man, Hari was a passionate activist and leader in the movement to end the Vietnam War and a promoter of civil rights. Hari's commitment to social justice causes continued throughout his professional life, first through his work at TecNica and then at Vanguard. He has striven to accomplish positive change on a community, societal and global scale, eschewing self-aggrandizement. This offense is aberrant in the context of Hari's overall life and work.

It is also urged upon the Court to consider the collateral consequences of Hari's conduct and his age and medical conditions. He is completely broke, has lost his home of 35 years (a modest apartment),

---

[6] The PSR recommends as a condition of Supervised Release that Hari Dillon have no contact with the victims in this case. There is no history in this case of Dillon communicating in any inappropriate way with a victim. Indeed, some of the victims remain close friends of Hari. He asks that the non-contact condition not be imposed.

and his reputation is completely destroyed. Of his own doing as he readily admits, these are nevertheless consequences of his conduct. At age 64, he also suffers from a number of maladies, not the least of which is diabetes, enlarged prostate, and hypertension.[7]

A sentence of 18 months imprisonment will also adequately reflect the seriousness of Hari's conduct, provide a just punishment, and promote respect for the law. He has never before been imprisoned and at age 64, 18 months is a harsh sentence. Given Hari's acceptance of responsibility and attitude toward his offense conduct there is no need sentence him to provide a personal deterrence to him or to protect the community from further crimes by him. This will never happen again.

It is also requested that the Court consider Hari's substantial assistance to the Government in the prosecution and conviction of Mouli Cohen. Hari testified truthfully and fully. He also aided the agents in apprehending Cohen. He has provided a valuable service.

Finally, as noted in the PSR, Hari Dillon is an ideal candidate for voluntary surrender. Although release or detention of defendants pending sentencing is addressed in 18 U.S.C. § 3143(a)(2), if a defendant can demonstrate that there are exceptional reasons why detention would not be appropriate, the district court has authority to permit voluntary surrender. *See United States v. Garcia,* 340 F.3d 1013 (9th Cir. 2003).[8] In determining whether exceptional reasons are present, the Ninth Circuit in *Garcia* held:

> As these cases indicate, a wide range of factors may bear upon the analysis. By adopting the term "exceptional reasons," and nothing more, Congress placed broad discretion in the district court to consider all the particular circumstances of the case before it and draw upon its broad 'experience with the mainsprings of human conduct.' *Mozes v. Mozes*, 239 F.3d 1067, 1073 (9th Cir. 2001) (internal quotation marks omitted). While we offer some guidance today, we place no limit on the range of matters the district court may consider. Rather, the court should examine the totality of the circumstances and, on the basis of that examination, determine whether, due to any truly unusual factors or combination of factors (bearing in mind the congressional policy that offenders who have committed crimes of violence should not, except in exceptional cases, be released pending appeal)

---

[7] It is noted that the Sentencing Commission, on November 1, 2010, amended USSG 5H1.4 to include health and age as possible bases for a mitigated sentence (Amendment 739).

[8] Section 3145(c), unlike § 3143(b), applies to defendants seeking release pending sentencing as well as to those seeking release pending appeal. The legal principles are equally applicable in both circumstances. *Garcia*, 340 F.3d at 1015 n 2.

Defendant's Sentencing Memorandum
*United States v. Dillon*, 10-00500 CRB                            10

it would be unreasonable to incarcerate the defendant prior to the appellate court's resolution of his appeal.

*Garcia,* 340 F.3d at 1018-19.

Here, voluntary surrender is appropriate for several reasons. Hari's pretrial release history and the PSR confirm that Hari is not a flight risk or a risk to the community. His illegal conduct ended in 2008, almost 5 years ago and there is no evidence that Hari has been involved in any other illegal activity. His crime was situational and will not recur. Voluntary surrender will spare the system expense, afford Hari an opportunity to seek medical services at his own expense and provide material testimony in a deposition[9] scheduled to commence on January 31, 2013 in the coordinated civil actions of :

1. *Janina M. Elder, as Chapter 11 Trustee in Bankruptcy for the Estates of Hari J. Dillon v. Sideman & Bancroft*, SFSC number CGC-10-498633, filed April 14, 2010;

2. *Mills v. The Vanguard Public Foundation*, SFSC number CGC-11-509665, filed March 29, 2011;

that has the potential to yield a substantial sum for restitution for the victims of the Mouli Cohen fraud. Voluntary surrender with a surrender date in approximately 8 weeks will enable Mr. Dillon to testify and complete his presently scheduled deposition and continue to provide substantial assistance to the bankruptcy trustee and civil attorneys in their ongoing efforts to secure monetary recovery for the victims of the Cohen fraud.

For the above reasons, it is respectfully requested that the Court sentence Hari Dillon to 18 months imprisonment, to be followed by a term of supervised release conditioned upon the payment of restitution.

Dated: January 22, 2013

                              Respectfully submitted,

                              Garrick S. Lew
                              Attorney for Defendant HARI JAMIL DILLON

---

[9] Attorney, J. David Black letter dated January 14, 2013, attached as Exhibit C.