MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

W. DOUGLAS SPRAGUE (CABN 202121)
HALLIE M. HOFFMAN (CABN 210020)
Assistant United States Attorneys

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102
   Telephone:  (415) 436-7200
   Facsimile:  (415) 436-7234
   E-mail:      doug.sprague@usdoj.gov
              hallie.hoffman@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR 10-0500 CRB |
| Plaintiff, ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| v. ) | |
| HARI JAMIL DILLON, ) | DATE: January 29, 2013<br>TIME: 10:00 a.m. |
| Defendant. ) | Honorable Charles R. Breyer |

      Hari Dillon devoted much of his life to fighting for individuals less fortunate than he and against injustice where he saw it.  After decades of those fights, however, he committed injustice against those who not only funded his ability to wage those fights, but who were his closest friends.  And he did so, at least in part, so he could enjoy a lifestyle experienced by only the most fortunate, including chauffeured limousine rides between stays at luxury hotels and frequent dining at the best restaurants and other expenses far exceeding his legitimate income.  To his credit, however, as soon as law enforcement asked him about the fraudulent expenditures, Mr. Dillon admitted what he had done and proceeded to substantially assist law enforcement in the investigation and prosecution of a con man far worse than Mr. Dillon.

GOVT. SENT. MEMO.;
CR 10-0547 CRB

For the reasons set forth below, as well as those in the thorough Presentence Investigation Report (PSR), the government respectfully requests that the Court sentence defendant to 30 months imprisonment, three years of supervised release, restitution to be determined within 90 days, no fine, and the mandatory special assessment of $400.

## I. The Nature and Circumstances of the Offenses

Having presided over the trial in *United States v. Samuel "Mouli" Cohen*, the Court is well aware of Mr. Dillon's offenses, which are also set forth in detail in the thorough PSR. The government will summarize the offenses here and attempt to provide some additional information on two points: when Mr. Dillon began siphoning money that he told victims was needed for Vanguard's role in the Ecast deal, and how he spent that stolen money.

In the Fall of 2002, Mouli Cohen convinced Mr. Dillon and others affiliated with Vanguard, such as Gina Warren and Sam Mills, that Ecast was about to be acquired by Microsoft. As a result, claimed Mr. Cohen, if Vanguard and its donors purchased Mr. Cohen's founder's shares in Ecast, the value of those shares would enjoy a tenfold increase when the acquisition closed. In late 2002 and into 2003, Vanguard donors paid Mr. Cohen approximately $6.2 million purportedly in exchange for more than one million shares of Ecast. Mr. Dillon did not divert any of these initial investment funds.

Throughout the following years, Mr. Cohen came up with one excuse after another to explain why the non-existent deal was delayed. The excuses included delays blamed on the United States Department of Justice and later regulators in the European Union, as well as Mr. Cohen purporting to "buy out" the Vanguard investors and paperwork attributed to that event. All of the excuses required Vanguard and its donors to contribute various "bonds" or other "fees" toward the deal, otherwise the Vanguard investors might lose not only every dollar they had put in to date, but the chance to profit when the deal finally occurred. And while he advanced excuses, he tried to divert attention from the non-existent deal. Mr. Cohen dangled purported direct donations to Vanguard from his ex-wife, his friend from overseas who led an investment consortium, and a deal involving an attorney in New York that would net Vanguard approximately $1.6 million.

It was during this time—the "bonds and fees" period—that Mr. Dillon began skimming funds that were designated for the Ecast opportunity. It is difficult to pinpoint precisely when Mr. Dillon began intentionally siphoning funds for two reasons. First, Mr. Dillon received several millions of dollars of personal loans from Jane Segal and Sam Mills in addition to—and separate from—the Ecast investment funds advanced by those two individuals. The checks/wires do not always indicate whether the funds were for personal loans or for "bonds and fees" associated with the Ecast deal. Second, and relatedly, the internal accounting for these payments became less and less accurate over time. Although Vanguard and Mr. Dillon used an accountant in the early years at issue, the use of the accountant and the quality and quantity of records provided to her decreased over time. Further complicating the issue is that Mr. Dillon loaned money to Vanguard and received loan repayments from Vanguard over the years; records reflect payments going back and forth between Mr. Dillon's accounts and Vanguard's accounts, many with notations that they were loans and loan repayments.

Based on the information the government has reviewed, however, it appears that Mr. Dillon began intentionally diverting purported Ecast deal funds for his own use in approximately the last quarter of 2004, but in no event earlier than late summer 2004. Mr. Dillon's theft of money earmarked for Vanguard/Ecast continued through 2007. In all, from approximately late 2004 through approximately late 2007, Mr. Dillon converted approximately $2.5 million of Vanguard investor/donor funds to his own use.

Mr. Dillon spent a substantial portion of these fraudulent proceeds in a manner inconsistent with his decades of commitment to social justice causes and his role as the head of Vanguard, where he earned between $74,000 and $87,000 per year from 1990 to the mid-2000s. For example, financial records reflect that Mr. Dillon spent tens of thousands of dollars at luxury hotels such as the Four Seasons and the St. Regis, thousands of dollars on limousines and a personal driver, thousands of dollars on frequent meals at fine dining restaurants in San Francisco and elsewhere, and hundreds of thousands of dollars on a down payment on a penthouse condominium in San Francisco. Some of these expenses may have been paid from the substantial personal loans Mr. Dillon secured from friends such as Jane Segal or the Mills, while

GOVT. SENT. MEMO.;
CR 10-0547 CRB                                    3

others—such as the approximately $60,000 of Dennis Kowalski's and Asake Bomani's money detailed in the Plea Agreement—were taken directly from money the victims thought was going to be directed to Vanguard and the Ecast deal. Regardless of the source, however, it is plain that at the same time Vanguard was on financial life support, Mr. Dillon was leading a luxurious lifestyle unwittingly funded by Vanguard donors and longtime friends and wholly inconsistent with his earned income level. Regardless of the source, the behavior was despicable and deserving of serious punishment.

And even before Mr. Dillon ever met Mouli Cohen, Mr. Dillon had sought personal loans from individuals for a stated purpose, and, although directing most of the funds to that purpose, had misused some of those funds for his personal benefit. For example, at trial, Mr. Dillon admitted to having received a $1.3 million personal loan to purchase a home for his son and a home for his aunt. Although he used the loan for those purposes, he also used a substantial portion of the funds to buy clothing, to dine out, to travel by limousine, to entertain, to buy electronics, to invest, and to pay tuition for his kids and private school tuition for his grandson. (Tr. 770-73.)

## II.     The Sentencing Guidelines

The parties entered into a plea agreement in July 2010, more than one year before the Superseding Indictment against Mouli Cohen and Cohen's ensuing trial. The Sentencing Guidelines calculations in the Plea Agreement included a Base Offense Level of 7, a 2-level enhancement for more than 10 victims, an 18-level enhancement for losses greater than $2.5 million but less than $7 million, and a 3-level reduction for acceptance of responsibility. Those calculations resulted in an Adjusted Offense Level of 24. Defendant's Criminal History Category is I, resulting in a Guidelines range of imprisonment of 51-63 months. The Plea Agreement requires the government to recommend those calculations, and the government does so here.

The PSR agrees with those elements of the calculations, but adds two enhancements. First, the Probation Officer applies a 2-level enhancement for a misrepresentation that the defendant was acting on behalf of a charitable organization (U.S.S.G. § 2B1.1(b)(9)(A)). (PSR, ¶

33.) Second, the Probation Officer applies a 1-level enhancement for a conviction under 18 U.S.C. § 1957 (U.S.S.G. § 2S1.1(b)(2)(A)). (PSR, ¶ 34.) Those calculations result in an Adjusted Offense Level of 27. Defendant's Criminal History Category is I, resulting in a Guidelines range of imprisonment of 70-87 months. Upon information and belief, the government anticipates defendant will not contest the accuracy of the Probation Officer's calculations.

**III.    Defendant's Substantial Assistance to Law Enforcement**

From approximately mid-2010 through the conclusion of Mouli Cohen's trial in November 2011, Dillon consistently, completely, and truthfully cooperated with law enforcement authorities. As a result, and pursuant to U.S.S.G. § 5K1.1, the government moves for a substantial reduction in Dillon's sentence of imprisonment.

A.    <u>Dillon Admits his Fraudulent Conduct</u>

After being approached by law enforcement, Dillon, through counsel, immediately took responsibility for what he had done and agreed to assist law enforcement in investigating his conduct and that of Mouli Cohen. Dillon met with law enforcement authorities in 2010 on more than one occasion and answered questions truthfully and completely. Dillon quickly agreed to waive indictment and to plead guilty to wire fraud and money laundering, which he did on or about July 1, 2010.

B.    <u>Investigation of Mouli Cohen</u>

Dillon's early cooperation and debriefings helped law enforcement corroborate some information it had learned during the investigation of Mouli Cohen, provided some new information regarding Cohen, and provided leads to other information about Cohen. Approximately two weeks after Dillon entered his guilty pleas, a federal grand jury indicted Cohen on multiple counts of wire fraud and money laundering.[1] As he likely will describe in more detail in his sentencing memorandum, Dillon also attempted to assist law enforcement in

---

[1] In August 2011, a Superseding Indictment was returned against Cohen. That Superseding Indictment added charges of tax evasion.

GOVT. SENT. MEMO.;
CR 10-0547 CRB                                    5

arresting Cohen in San Francisco, but Cohen was able to thwart those efforts and was arrested weeks later in Beverly Hills.

### C. Trial Preparation

Dillon also substantially assisted the government in preparing for trial in *United States v. Samuel "Mouli" Cohen*. Dillon met with the government on multiple occasions in the weeks leading up to that trial. These lengthy meetings frequently took place in the evenings, on weekends, or both, and involved reviewing at least hundreds of pages of documents. These documents included e-mails between Dillon and Cohen or Dillon and other victims that used language that would have been significantly more difficult to decipher and to explain to a jury without Dillon.

### D. Trial Testimony

Finally, Dillon testified at the trial of Mouli Cohen. Dillon's testimony spanned three days, including approximately one full day of cross-examination by an outstanding and very well prepared criminal defense attorney. In the government's opinion, Mr. Dillon testified truthfully and was a credible witness.

U.S.S.G. § 5K1.1 includes a non-exhaustive list of five factors that may be considered in determining an appropriate sentence reduction for a defendant who has provided substantial assistance in the investigation or prosecution of another person: (1) the court's evaluation of the significance and usefulness of the assistance, taking into account the government's evaluation of the assistance; (2) the truthfulness, completeness, and reliability of the information and testimony provided; (3) the nature and extent of the assistance; (4) any injury or risk of injury to the defendant or his family resulting from his assistance; and (5) the timeliness of the assistance. Mr. Dillon's assistance and testimony were timely, significant, useful, truthful, complete, and reliable. The nature and extent of his assistance did not involve, for example, wearing a body wire or a risk of injury to defendant or his family, but it did involve reviewing and discussing at least hundreds of pages of documents over the course of many hours of meetings with law enforcement. In sum, Mr. Dillon's assistance was plainly substantial and warrants a significant reduction from the applicable Sentencing Guidelines range of imprisonment.

### IV.     Restitution

The government agrees with the Probation Officer that the specific amount and details of restitution, which will be at least $2.5 million, should be determined in the next 90 days.

### V.      Surrender to Custody

The government has received one letter from attorneys representing certain victims in civil litigation involving Mr. Dillon and others in which the attorneys request that Mr. Dillon be allowed to self-surrender so he may sit for a multi-day deposition in these civil proceedings. (The government has been informed that another such letter will be submitted to the Court, but the government has only seen one to date.)  Based on the government's understanding of the status of this part of the civil litigation—which includes a meaningful prospect of partial recovery for some victims—the government supports the request that Mr. Dillon be allowed to self-surrender approximately 30 days after sentencing to allow the deposition to take place and thus hasten a resolution of these civil proceedings.

### VI.     Conclusion

For these reasons and those set forth in the PSR, the government respectfully requests that the Court sentence defendant to 30 months imprisonment, three years of supervised release, restitution to be determined within 90 days, no fine, and the mandatory special assessment of $400.

DATED: January 23, 2013              Respectfully submitted,

MELINDA HAAG
United States Attorney


            /s/
W. DOUGLAS SPRAGUE
HALLIE M. HOFFMAN
Assistant United States Attorneys

GOVT. SENT. MEMO.;
CR 10-0547 CRB                          7